**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

_____

Civil Action No. _____

CROSS RIVER BANK,
      Plaintiff,

v.

JULIE ANN MEADE, in her official capacity as Administrator of the Uniform Consumer Credit
Code for the State of Colorado,

      Defendant.

---

### COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

---

### SUMMARY OF THE ACTION

1.     Plaintiff Cross River Bank ("Cross River") seeks a declaration to protect its federal statutory and contractual rights. Ongoing activity by Defendant—the Administrator of Colorado's Uniform Consumer Credit Code (the "Administrator")—directly threatens Cross River's federally protected rights to extend and freely transfer validly-made loans on a nationwide basis, consistent with the Federal Deposit Insurance Act ("FDIA") and centuries-old federal case law.

2.     Cross River is a federally regulated, federally insured bank, chartered in the State of New Jersey and supervised by both the Federal Deposit Insurance Corporation ("FDIC") and the New Jersey Department of Banking and Insurance. It is a community bank and leading marketplace lender, extending credit nationwide to individuals and small businesses who wish to borrow money for a wide range of purposes including emergency expenses, life events, medical

expenses, home improvement, relocation, and consolidation of existing debt at lower interest rates.

3.      Pursuant to Section 27 of the FDIA—which expressly preempts individual state lending laws—Cross River has the authority to originate loans nationwide (regardless of the domicile of the borrower) at interest terms permitted by the laws of New Jersey, and interest and fees on such loans can be assessed in accordance with New Jersey law, regardless of where the borrower resides.  And since it is a longstanding and cardinal rule of federal banking law that a loan that is "valid when made" remains valid for its entire term, Cross River may subsequently retain or transfer those loans freely to third parties.

4.      As expressly contemplated in FDIC guidance, Cross River has contracted with a financial technology services provider, Marlette Funding, LLC ("Marlette"), to market, operate a website for, and help process unsecured consumer loans.  Cross River itself is the lender for each and every loan in the program with Marlette—under terms that are clearly and expressly disclosed to the borrowers—and Cross River is responsible for, among other things, the credit policy and underwriting criteria for the program as well as the program's compliance with applicable laws and regulations.

5.      Cross River originates every loan made under the program.  It continues to retain a randomly-selected population of the loans to maturity and sells others to Marlette, though it retains an ongoing economic interest even in the loans it sells.

6.      Cross River's ability under federal law to sell or otherwise transfer loans it makes is an essential aspect of its business model, enabling it to manage liquidity, diversify its portfolio, and obtain funds to make additional loans.  Without the ability to sell or transfer the loans on

their original terms as authorized by federal law, Cross River's business and the valuable service

it provides to individuals and small businesses would be severely constrained.

7.    The Administrator directly challenges Cross River's lending program and the

principles of federal law on which it is based, but she has made a strategic decision not to sue

Cross River itself.  Despite the fact that Cross River originates all the loans in the program, the

Administrator asserts that such loans to Colorado residents are <u>not</u> subject to the federal and New

Jersey laws that apply to Cross River, but instead to Colorado laws regarding the terms

(including interest rates, fees, and governing law) on which loans may be extended.

8.    The Administrator has conducted examinations, threatened enforcement action,

and ultimately filed a lawsuit—currently pending before this Court as civil action 1:17-cv-

00575-PAB—against Cross River's contractual counterparty, Marlette, through which the

Administrator seeks to enjoin Marlette from enforcing terms of loans that were validly originated

by Cross River and validly transferred by Cross River in accordance with long-settled federal

law.  Through her enforcement action, the Administrator would prohibit Cross River from selling

to Marlette any loans Cross River makes to Colorado residents, unless Cross River conforms

these loans to the Colorado-specific restrictions on interest rates, fees, and governing law—

notwithstanding federal law to the contrary.

9.    Although the Administrator's lawsuit necessarily implicates core federal rights

and principles, the complaint does not so much as mention the FDIA.  And although the lawsuit

is a direct challenge to Cross River's loans and indeed the very foundation of its business—

including Cross River's right to originate, transfer, and continue to earn income from its loans—

Cross River was not named as a defendant.

10.     A declaration is essential here to protect Cross River's federal statutory rights and the integrity of the lawful contracts it has made, to stop ongoing injuries to Cross River, and to prevent further injury.  The Administrator's actions have already caused harm and are continuing to cause harm to Cross River.  In the absence of a declaration upholding Cross River's federally protected rights, Cross River will continue to suffer harm directly as a result of the Administrator's unlawful actions.  Cross River stands to receive less revenue in connection with loans already extended and sold to Marlette; Cross River's rights to originate and sell new loans—consistent with federal law and Cross River's lawful contracts with Marlette—will be threatened; and basic principles of federal law on which Cross River and other participants in the interstate banking system depend will be thrown into doubt, threatening this crucial facet of the national economy and valuable source of available credit for consumers and small businesses.

## THE PARTIES

11.     Plaintiff Cross River Bank is a federally regulated, state-chartered commercial bank that operates under a charter granted by the New Jersey Department of Banking and Insurance.  Cross River's deposits are insured by the FDIC.  Cross River has its principal place of business at 400 Kelby Street, Fort Lee, New Jersey.  Cross River provides personal and corporate banking services and direct lending services, such as commercial real estate and small business loans.  In addition to these traditional banking services, Cross River also utilizes financial technology to provide innovative banking services, such as marketplace lending, to its customers.

12.     Defendant Julie Ann Meade is the Administrator of Colorado's Uniform Consumer Credit Code and is named in her official capacity.  The Administrator's principal

office is located at the Ralph L. Carr Colorado Judicial Center, 1300 Broadway, 6th Floor,

Denver, Colorado.

## JURISDICTION AND VENUE

13.     Cross River brings this action for declaratory judgment and injunctive relief under

(a) the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; (b) the FDIA, including 12

U.S.C. § 1831d; and (c) the Supremacy Clause of the United States Constitution, U.S. Const. Art.

VI, Cl. 2.  Accordingly, this Court has federal question subject matter jurisdiction over this

action pursuant to 28 U.S.C. § 1331.

14.     Venue in the District of Colorado is proper under 28 U.S.C. § 1391 because

Defendant may be found within the District of Colorado and because a substantial part of the

events giving rise to the claims asserted in this Complaint occurred in this District.

## FACTUAL ALLEGATIONS

**A.  Cross River Bank and the Marketplace Lending Model**

15.     Cross River is a federally regulated, New Jersey state-chartered bank that is

regulated and supervised by the FDIC and the New Jersey Department of Banking and Insurance.

Cross River was chartered in 2008.

16.     Following the financial crisis in the last decade, many banks ceased or

significantly reduced their unsecured lending, leaving many consumers and small businesses

with no access to credit or with access only to expensive short-term financing, like credit cards

or payday loans.  Smaller banks, such as Cross River, have addressed this unmet need by

partnering with financial technology companies to develop marketing programs and marketplace

technology platforms.  Through these online platforms, applicants can apply to banks for loans in

a simple, clear, convenient and easy-to-manage way—wherever they are located across the country.

17.     In the marketplace lending model, Cross River originates unsecured consumer and small business loans pursuant to contracts (i.e., loan agreements) made directly with the borrowers.  These contracts clearly state that Cross River is the lender.  Cross River establishes the terms and conditions of the loans, sets the credit criteria, reviews the loan documentation, and approves and funds each loan.

18.     As part of this model, Marlette and other similar entities provide important services in connection with the loans which Cross River originates, such as marketing, application processing, and overseeing sub-servicers for servicing and collections—all under the close supervision of Cross River to ensure compliance with the complex set of federal and New Jersey laws, rules, and regulations applicable to lending programs.

19.     Pursuant to the FDIA, Cross River may originate loans to borrowers nationwide, provided it complies with applicable federal and New Jersey state law.  Cross River's loans thus need not separately comply with the state lending laws of each borrower's home state.

20.     For example, Cross River may charge interest rates consistent with New Jersey law for all loans it originates—including those issued through a marketplace lending platform— regardless of where the borrower resides.

21.     Likewise, Cross River may charge fees consistent with New Jersey law for all loans it originates—including those issued through a marketplace lending platform—regardless of where the borrower resides.

22.     This federally created legal structure facilitates nationwide lending of all loan types, allowing banks to lend to borrowers across the country without having to comply with 50 different sets of state banking regulations.

23.     As such, federal law permits Cross River to lawfully lend to borrowers in Colorado and other states at rates and with fees that comply with New Jersey and federal law, even if those rates or fees exceed those allowed by laws in Colorado or such other states.

24.     Utilizing the marketplace lending model, Cross River offers loans to borrowers nationwide, pursuant to contractual relationships with financial technology platform partners.

25.     This marketplace lending model is essential to the way Cross River does business. It leverages third-party partners for their expertise in areas such as marketing, customer acquisition, application processing, and servicing and collections.  And it depends on the sale of these loans to enable it to originate additional loans, given its business model, liquidity considerations, and balance sheet constraints.

26.     Cross River is responsible for consumer compliance and is accountable to its prudential regulators for any potential violation.

**B.  <u>Oversight of Lending Platforms by Cross River and Federal Regulators</u>**

<u>Cross River's Oversight of Its Marketplace Lending Platforms</u>

27.     Cross River abides by the FDIC, OCC, and interagency guidance on third-party lending.  Cross River oversees its lending platforms with an effective compliance management system, which includes the pillars of best practice: policies and procedures, complaints management, transaction monitoring, training and assessments of the knowledge level and attitude of management and personnel of the financial technology platform partners.

28.     Cross River is actively involved at all stages and in all aspects of its lending programs, including those utilizing the marketplace lending model.  All of Cross River's lending programs are established, administered and overseen with the active engagement and oversight of its Board of Directors.

29.     Prior to contracting with a financial technology platform partner, Cross River conducts extensive due diligence regarding the potential partner and establishes program guidelines to ensure compliance with all regulatory requirements and Cross River's internal standards.

30.     The program guidelines are memorialized in one or more loan program agreements that expressly define each party's obligations and requirements.

31.     Cross River establishes and controls the credit policy and underwriting criteria deployed on each of its lending platforms.

32.     Cross River actively monitors and reviews the performance of its financial technology platform partners to ensure that they are complying with all applicable law and the agreements establishing and governing the program.  This monitoring includes formal review and approval procedures, site visits, risk assessments, and compliance audits.

33.     Cross River monitors customer experience and maintains regulatory compliance through periodic reporting and direct engagement with each lending platform.

34.     The underwriting guidelines and the credit policy are established by Cross River and approved by its Board of Directors.  Any change to the credit policy must be reviewed and approved by the Cross River Board of Directors.

<u>The FDIC's Oversight of Cross River and Marketplace Lending Platforms</u>

35.     The FDIC and the New Jersey Department of Banking and Insurance examine Cross River at least annually and review all of Cross River's lending programs.

36.     Examiners from the FDIC and New Jersey Department of Banking and Insurance are charged with evaluating compliance with applicable laws and regulations—federal and state—that are pertinent to the bank being examined.  They evaluate not only compliance with laws and regulations, but also the adequacy of audits and internal controls.  Banks grant examiners access to all records and employees of the bank to facilitate examinations.

37.     Federal banking law specifically contemplates that federally insured banks will enter into relationships with third parties to provide services in connection with their lending programs.  Congress has addressed such relationships by granting the FDIC the power to examine both the banks <u>and</u> the third parties who provide such services.  Importantly, the FDIC—pursuant to 12 U.S.C. § 1867(c)—evaluates activities conducted through third-party relationships as though the activities were performed by the banking institutions themselves.

38.     The FDIC further recognizes that banks may rely substantially on services provided by third parties in some lending programs, including programs in which the third parties also purchase loan receivables.  Accordingly, the FDIC has issued extensive guidance about managing such third-party relationships.  <u>See</u> FDIC, Financial Institution Letter:  Guidance for Managing Third-Party Risk, FIL-44-2008 (June 6, 2008).

39.     The FDIC also expressly contemplates third-party arrangements for marketplace lending platforms, including by its recent issuance of proposed guidance in July 2016 that addresses oversight and management of such lending platforms.  <u>See</u> FDIC, Financial Institution

Letter:  Proposed Guidance for Third-Party Lending, FIL-50-2016 (July 29, 2016).  The proposed guidance acknowledges the advantages that third-party lending arrangements can present, such as "provid[ing] institutions with the ability to supplement, enhance, or expedite lending services for their customers" and "enabl[ing] institutions to lower costs of delivering credit products and to achieve strategic or profitability goals."  Id. at 1.  The FDIC also has acknowledged the benefits of a bank's participation in such an arrangement, describing it as "an attractive source of revenue."  See FDIC, Marketplace Lending, Supervisory Insights (Winter 2015), at 18.

### C.  Cross River's Oversight of Marlette's Actions in the Lending Platform

40.     In February 2014, Cross River and Marlette, a Delaware limited liability company, entered into certain contracts (the "Agreements") that established a marketplace lending platform (the "Program").

41.     The Program offers consumers simple, multi-year loans, all of which are originated, issued, and funded by Cross River.

42.     As reported by a substantial majority of participants in the Program, the primary purpose of borrowers who take out loans through the Program is debt consolidation.

43.     Loans in the Program (the "Loans") generally range in size from $2,000 to $35,000, though some prime borrowers may qualify for loans up to $50,000.  The average size of a Loan to a Colorado borrower is approximately $15,000.

44.     The weighted average annual percentage rate ("APR") of Colorado borrowers' Loans is less than 20%, and the Loans carry no prepayment penalties.

45.     This weighted average APR is lower than Colorado's maximum interest rate and lower than the Consumer Financial Protection Bureau's threshold for high-interest loans.

46.     Colorado borrowers in the Program have an average income of over $90,000 and a weighted average FICO score of greater than 700.

47.     Cross River controls and is responsible for the credit policy and determining the underwriting criteria for the Program.

48.     All of Marlette's actions under the Agreements are performed under Cross River's oversight, in accordance with FDIC third-party oversight requirements (including the proposed FDIC third-party lending guidance), and Cross River actively monitors and reviews Marlette's performance to ensure that it complies with applicable law and the Agreements.

49.     The FDIC also oversees all of Marlette's actions under the Agreements, as it evaluates activities conducted through third-party relationships with banking institutions as though the activities were performed by the banking institutions themselves.

50.     While Marlette has primary responsibility for marketing the Loans, Cross River reviews and approves all marketing, advertising, and sales materials prepared by Marlette for the Program.

51.     Cross River conducts a regular review of all websites maintained by Marlette for the Program.

52.     Cross River monitors customer experience for the Program, including through periodic reporting and compliance testing and monitoring.

53.     Marketing materials for the Program identify Cross River as the entity that makes the Loans to customers.  The materials also state that Cross River is located in New Jersey.

54.     Borrowers requesting loans use Marlette's platform and receive materials approved by Cross River that present the structure and terms of the Loans, including Cross River's role and the applicable charges.

55.     The Loan agreements are reviewed and approved by Cross River prior to implementation.

56.     Under the Program, Cross River offers loans to consumers nationwide, including in Colorado.

57.     The Loan agreements identify Cross River as the entity that makes the Loans to customers and state that the borrower's agreement is with Cross River.  The agreements also state that Cross River is located in New Jersey.

58.     The Loan agreements reflect the interest rate that will be charged during the term of the Loan.

59.     Even though some Loans to some borrowers exceed Colorado's interest rate limit, all of the Loans that Cross River offers through the Program are at interest rates that are at or below the maximum permitted by New Jersey law.

60.     The Loan agreements state that, to the extent that state law applies to the agreement, the laws of the State of New Jersey apply.

61.     Any such choice-of-law provision is permitted under New Jersey law.

62.     The Loan agreements state that the borrower agrees to pay a late fee of $15 if a payment is not received within three days of the due date.

63.     Any such late fee is permitted under New Jersey law.

64.     The Loan agreements state that the borrower agrees to pay a fee of "$25 or such other amount as provided by law" for processing a request for an extension of the agreement.

65.     Any such extension fee is permitted under New Jersey law.

66.     All Loans also comply with applicable federal law.

67.     While Marlette processes the applications and obtains the necessary loan documentation prior to funding, Cross River oversees that work.

68.     In addition, Cross River reviews and confirms the accuracy of all Truth-in-Lending statements delivered to borrowers for the Loans.

69.     Prior to funding a loan under the Program, Cross River reviews the loan documents to ensure that the loan meets the Program criteria set forth in the Agreements and adheres to Cross River's credit policy.  If it does, the loan will be approved and funded.  If it does not, Cross River will not fund the loan.

70.     As described in Paragraph 41 above, Cross River is the lender for all Loans made under the Program.

71.     Cross River originates and holds every Loan made under the Program for a period of time.  It then makes a determination to sell certain Loans and retain others for its loan portfolio purely on a random basis across all credit grades, reflective of the origination profile. Cross River continues to earn interest on the Loans that it retains until the Loans mature.

72.     Further, notwithstanding the sale of any Loans, Cross River retains an ongoing financial interest in all such Loans.  For example, it receives an ongoing servicing fee based on the percentage of the portfolio as a whole that has not been charged off.

73.     While Marlette has primary responsibility for overseeing sub-servicers that service and collect on the Loans, Cross River also oversees those activities.

74.     In order to maintain regulatory compliance, Cross River conducts independent information security and compliance audits and regulatory risk assessments of the Program, including periodic fair lending and Unfair and Deceptive Acts or Practices (UDAP) reviews.

75.     Cross River conducts site visits of Marlette's facilities at least annually to monitor compliance with applicable laws, rules, regulations, and the Agreements.

**D.  The Colorado Enforcement Action Against Marlette**

76.     The Administrator, following a routine examination of Marlette,[1] cited Marlette for purported violations of Colorado loan regulations, including interest rate limits, in a report of examination issued in February 2016.  Marlette responded, disputing the applicability of Colorado law to the Loans that were originated by Cross River.  On April 15, 2016 and July 27, 2016, the Administrator issued letters taking the position that Colorado law applied.  Marlette disputed this contention in responses to the Administrator, and representatives of both Marlette and Cross River met with the Administrator and representatives of the Colorado Attorney General's office in September 2016 to confirm that all loans were originated by Cross River (and not Marlette) and to explain in detail the active involvement of Cross River in the Program.

77.     On January 27, 2017, Defendant Meade, in her role as Administrator of Colorado's Uniform Consumer Credit Code, filed suit in Denver District Court against Marlette regarding the Program, seeking damages and injunctive relief.  Despite having met with Cross

---

[1] Although Marlette does not make loans in Colorado, it holds a license to serve as a supervised lender because Colorado requires such a license not only to lend (i.e., make loans), but also to acquire and service loans. See Colo. Rev. Stat. § 5-2-301.

River, the Administrator failed in the initial complaint even to so much as mention Cross River

or its role as the originator of all of the Loans at issue.  The Administrator subsequently amended

the complaint, however, to acknowledge Cross River's role in issuing and holding the Loans, and

in transferring them to Marlette.  The action was subsequently removed to this Court, with the

caption <u>Colorado v. Marlette Funding LLC</u>, Case No. 17-cv-00575-PAB (the "Marlette Action").

78.     In the Marlette Action, the Administrator alleges that Colorado law should apply

to the Loans that Cross River made to Colorado residents that are not retained by Cross River.

She acknowledges that state-chartered banks like Cross River can, pursuant to federal law,

lawfully lend to borrowers in Colorado and other states at rates that exceed the interest and other

finance charges imposed by state law, but contends that banks cannot validly sell or assign such

loans to non-banks even if the loans were valid when made.

79.     The Administrator further claims that Cross River is not the "true lender" of the

Loans that it sells to Marlette or other non-bank designees because she claims it does not bear the

"predominant economic interest" in the Loans at an unspecified time.

80.     Based on these arguments, the Administrator contends that Marlette cannot

enforce the terms of the Loans that were originated and transferred by Cross River, and that its

efforts to do so have violated Colorado laws regarding finance charges, delinquency charges,

deferral charges, and choice-of-law provisions.

81.     The Administrator brings three claims in her amended complaint.  In the first, she

alleges that Marlette has assessed and collected finance and delinquency charges from borrowers

that exceed what is permitted under Colo. Rev. Stat. §§ 5-2-201 and 5-2-203.  In the second, she

claims that the Loan agreements include choice-of-law clauses that select non-Colorado law, in

violation of Colo. Rev. Stat. § 5-1-201(8).  In her final claim, she argues that the Loan

agreements provide for $25 extension fees in violation of Colo. Rev. Stat. §§ 5-2-201 and 5-2-

204.

      82.      The Administrator seeks an injunction prohibiting Marlette and its affiliates from

continuing to service Loans according to the Loan agreements, which she alleges violate

Colorado law.  In addition, she asks the Court to order Marlette to pay refunds to borrowers for

what she characterizes as excess charges.  She also asks the Court to award her civil penalties at

least equal to the total amount of finance charges due under the Program loan agreements.

      83.      There is no allegation in the Marlette Action that any consumers are suffering

harm or that Cross River or Marlette (or any of their affiliates or other programs) are engaged in

predatory lending.  To the contrary, while it is undisputed that some of the Loans may, in fact,

exceed the rates permitted by Colorado law, all parties agree that the Loans comply with the laws

of New Jersey and that Cross River and its programs have complied with applicable FDIC and

New Jersey regulations.  The only issue to be resolved in the Marlette Action is whether the

Administrator may enforce Colorado's state statutory limits on interest, fees, and the governing

law on Loans originated and sold by Cross River.

      84.      The Administrator has also brought another lawsuit raising similar claims against

Avant of Colorado, LLC ("Avant"), for loans it purchased from WebBank, a Utah-chartered

bank (the "Avant Action").  The Avant Action was also filed in Denver District Court; it was

subsequently removed to this Court under the caption <u>Colorado ex rel. Meade v. Avant of</u>

<u>Colorado, LLC</u>, Case No. 1:17-cv-00620-WJM-STV.  As with the <u>Marlette</u> complaint, the

Administrator's amended complaint against Avant acknowledges the role of a state-chartered

bank in originating the loans at issue, but seeks relief only against the entity that acquired and

services the loans.

85.     The Marlette Action directly challenges Cross River's federally protected rights to

originate loans to borrowers nationwide with interest rate (and other) terms permitted by its

home state of New Jersey and to sell those loans to third parties with the assurance that the loans'

original terms will remain valid after the loans are sold.

86.     Section 27 of the FDIA provides that state-chartered banks may charge the

interest rates of the banks' home states to borrowers in all 50 states, notwithstanding individual

states' laws regarding the terms, including interest rates and fees, on which loans may be

extended.

87.     The relevant portions of Section 27 setting forth, as applicable to the

Administrator's actions, its express preemption and remedial scheme provisions are as follows:

> Interest rates. In order to **prevent discrimination against State-chartered insured depository institutions**, including insured savings banks, or insured branches of foreign banks **with respect to interest rates**, if the applicable rate prescribed in this subsection exceeds the rate such State bank or insured branch of a foreign bank would be permitted to charge in the absence of this subsection, **such State bank or such insured branch of a foreign bank may,** *notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section*, take, receive, reserve, and **charge on any loan** or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank or such insured branch of a foreign bank is located or at **the rate allowed by the laws of the State, territory, or district where the bank is located**, whichever may be greater.

12 U.S.C. § 1831d(a) (emphases added).

<u>Interest Overcharge; Forfeiture; Interest Payment Recovery</u>.  If the rate prescribed in subsection (a) of this section exceeds the rate such State bank or such insured branch of a foreign bank would be permitted to charge in the absence of this section, and such State fixed rate is thereby preempted by the rate described in subsection (a) of this section, **the taking, receiving, reserving, or charging a greater rate of interest than is allowed by subsection (a)** of this section, when knowingly done, shall be **deemed a forfeiture** of the entire interest which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon. If such greater rate of interest has been paid, **the person who paid it may recover in a civil action** commenced in a court of appropriate jurisdiction not later than two years after the date of such payment, an amount equal to twice the amount of the interest paid from such State bank or such insured branch of a foreign bank taking, receiving, reserving, or charging such interest.

12 U.S.C. § 1831d(b) (emphases added).

88.     Cross River is located in New Jersey and therefore is, pursuant to Section 27, entitled to offer loans to borrowers in any state on terms permitted by the laws of New Jersey.

89.     Section 27 mirrors Sections 85 and 86 of the National Bank Act, which pre-date Section 27 and apply to national banks.  Indeed, Section 27 was enacted because state-chartered banks were at a competitive disadvantage to national banks, which—under Section 85—were able to export their home states' rates to borrowers in other states and to offer uniform terms to borrowers nationwide.  To introduce new sources of credit and to encourage lending by state-chartered banks, Congress enacted the Depository Institutions Deregulation and Monetary Control Act of 1980, which added Section 27 to the FDIA and put state-chartered banks (and, through similar provisions, other types of lenders) on an equal footing with national banks with respect to state law regulation of interest rates.

90.     In addition, longstanding federal case law establishes the "valid when made" principle, which dictates that a loan which was non-usurious when made cannot become usurious

upon assignment.  This principle has been a keystone of national banking law since at least the United States Supreme Court's 1828 decision in <u>Gaither v. Farmers' & Mechanics' Bank of Georgetown</u>, 26 U.S. (1 Pet.) 37, 43 (1828), in which the Court explained that "the rule cannot be doubted, that if the note [is] free from usury, in its origin, no subsequent usurious transactions respecting it, can affect it with the taint of usury."  <u>Accord</u> <u>Nichols v. Fearson</u>, 32 U.S. (7 Pet.) 103, 109 (1833).

91.     As explained nearly 200 years later in May 2016 by the Solicitor General of the United States, "[u]nder the long-established 'valid-when-made' rule, if the interest-rate term in a bank's original loan agreement was nonusurious, the loan does not become usurious upon assignment, and so the assignee may lawfully charge interest at the original rate."  Brief for the United States as *Amicus Curiae*, <u>Midland Funding, LLC v. Madden</u>, No. 15-610, 2016 WL 2997343, at *8 (U.S. May 24, 2016).

92.     The Marlette Action is directly contrary to Section 27—which preempts any state laws regarding the terms, including interest rates and fees, on which loans may be extended— and the longstanding "valid when made" doctrine.

**E.  <u>The Administrator's Interference with Federal Banking Law</u>**

93.     Cross River has been—and continues to be—harmed as a result of the Administrator's unlawful actions, including her initiation and prosecution of the Marlette Action, which directly challenge the interstate banking system and infringe on Cross River's core rights under federal law (including the FDIA) to originate, sell, transfer, and securitize loans.

94.     First, Cross River will receive less revenue in connection with Loans already extended and transferred to Marlette due to the Administrator's interference with Marlette's efforts to service the Loans according to their terms.

95.     Second, Cross River's ability to extend and transfer new Loans—consistent with federal law and Cross River's lawful contracts with Marlette—has been impaired.  The Administrator's actions also create uncertainty regarding representations, warranties, and conditions precedent in the Agreements and therefore interfere with the performance of the agreements and their continued viability.

96.     Third, Cross River's ability under federal law to transfer the Loans is an essential aspect of its business model, enabling it to mitigate risk, manage liquidity, and obtain funds to make additional loans.  Cross River's other marketplace lending platforms—and indeed its whole business—are severely damaged by any diminution in the ability to transfer the Loans on their original terms as authorized by federal law.  Any such uncertainty regarding whether these core federal rights will be enforced also has an immediate and destructive effect on secondary markets for loan sales (in which Cross River and many other banks participate).

97.     Finally, the Administrator's actions undermine and hinder basic principles of federal banking law on which Cross River and other participants in the interstate banking system depend.   For example, the transferability of loans on their original terms promotes liquidity and allows for asset diversification for federally insured banks, which reduces systemic risk for the banks and for federal entities—such as the FDIC—who insure such banks.  See, e.g., FDIC, Risk Management Manual of Examination Policies, § 6.1 at 7 (recognizing that "[s]ales in the

secondary market can provide fee income, relief from interest rate risk, and a funding source to the originating bank").

98.      To address these current and ongoing injuries, Cross River seeks a declaration protecting its federally conferred rights to extend and freely transfer validly-made loans on a nationwide basis and confirming that efforts like the Administrator's—to enforce state laws, rules, or regulations that are inconsistent with Cross River's federally conferred rights—are preempted.

## COUNT I

### DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
Federal Preemption of Colorado Revised Statutes §§ 5-2-201, 5-2-203, 5-2-204, and 5-1-201(8)

99.      Cross River repeats, re-alleges, adopts, and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

100.     Federal law, including without limitation the FDIA (in particular 12 U.S.C. § 1831d), authorizes Cross River, as a New Jersey-chartered, FDIC-regulated bank, to offer loans to borrowers in any state on the same terms that it can offer to New Jersey borrowers.

101.     Federal law, including without limitation the FDIA (in particular 12 U.S.C. § 1831d), authorizes Cross River to originate loans with the interest rates, finance and delinquency charges, governing law, and deferral fees offered in the Program.

102.     Federal law, including without limitation the FDIA and 12 U.S.C. § 1867, authorizes Cross River to contract with third parties for loan servicing and other functions that support its marketplace lending platforms.

103.     Federal law, including without limitation the FDIA (in particular 12 U.S.C. § 1831d) and the long-settled "valid when made" doctrine, authorizes Cross River to originate

and sell loans to third parties, who may then continue to enforce the loan terms that were set when Cross River originated the loans.

104.    Because federal law authorizes Cross River to issue loans to borrowers in any state with the interest rates, charges, governing law, and fees offered in the Program, and because the "valid when made" rule applies as a matter of federal law to loans issued and sold by state-chartered banks, the Marlette Action is preempted, and Colorado's laws regarding the terms on which loans may be extended cannot be applied to Loans originated by Cross River.

105.    As set forth more fully above, the Administrator's actions—including her initiation and pursuit of the Marlette Action—are causing immediate and deleterious effects on Cross River's lawful commercial activities and contractual relationships, and her actions will cause further harm if allowed to continue unabated.

106.    Accordingly, under 28 U.S.C. § 2201, Cross River is entitled to a declaration that its activities and Marlette's activities in connection with the Program comply with applicable federal law and that any Colorado laws or regulations that interfere with federal law are preempted.

107.    Further, Cross River is entitled to a permanent injunction barring the Administrator and others from seeking to enforce preempted Colorado laws or regulations, including and in particular Colo. Rev. Stat. §§ 5-2-201, 5-2-203, 5-2-204, and 5-1-201(8), against Cross River or Marlette in connection with the Program, whether through the Marlette Action or otherwise.

## PRAYER FOR RELIEF

108.     **WHEREFORE**, in light of the foregoing, Cross River prays that judgment be entered in its favor and prays for:

(a)     A declaration that the actions of Cross River and Marlette in connection with the Program are permitted under applicable federal law;

(b)     A declaration that, insofar as the Administrator seeks to enforce Colorado law against Cross River and Marlette in connection with the Program, Colorado's Uniform Consumer Credit Code, and in particular, sections 5-2-201; 5-2-203; 5-2-204; and 5-1-201(8) of the Colorado Revised Statutes, are completely preempted by the FDIA, 12 U.S.C. § 1831d, and/or other provisions of federal law;

(c)     A permanent injunction barring the Administrator from enforcing the provisions of the Colorado Uniform Consumer Credit Code against Marlette or Cross River in connection with the Program, whether in the Marlette Action or otherwise; and

(d)     Such further equitable or other relief as the Court deems just and proper.

Dated: April 3, 2017                              Respectfully submitted,


                                                  DAVIS POLK & WARDWELL LLP


                                                  /s/  *Edmund Polubinski III*

                                                  Edmund Polubinski III
                                                  Lynn Earl Busath
                                                  Bryan McArdle
                                                  450 Lexington Avenue
                                                  New York, New York 10017
                                                  Telephone: (212) 450-4000
                                                  Facsimile: (212) 701-5800
                                                  edmund.polubinski@davispolk.com
                                                  lynn.busath@davispolk.com
                                                  bryan.mcardle@davispolk.com


                                                  WHEELER TRIGG O'DONNELL LLP
                                                  Craig May
                                                  370 17th Street
                                                  Suite 4500
                                                  Denver, Colorado 80202
                                                  (303) 292-2525
                                                  may@WTOtrial.com


                                                  *Attorneys for Plaintiff Cross River Bank*