**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:17-cv-00832-PAB-KMT

CROSS RIVER BANK,

      Plaintiff,

v.

JULIE ANN MEADE, in her official Capacity as Administrator of the Uniform Consumer Credit Code for the State of Colorado,

      Defendant.

---

**BRIEF OF *AMICI CURIAE* THE CLEARING HOUSE ASSOCIATION L.L.C., AMERICAN BANKERS ASSOCIATION, AND LOAN SYNDICATIONS AND TRADING ASSOCIATION**

---

      The Clearing House Association L.L.C., American Bankers Association, and Loan Syndications and Trading Association hereby submit this brief as *amici curiae* in the above-captioned action.[1]

      *Amici* are associations whose members provide credit to the consumers and small businesses that form the backbone of the U.S. economy.[2] *Amici* have a substantial interest in this action, which implicates a state-chartered, federally regulated bank's right to originate and sell loans to third parties pursuant to the "cardinal" rule, recognized by law (including by the U.S. Supreme Court) for hundreds of years, that a loan validly originated cannot become invalid because it is subsequently sold or assigned to another party. The positions taken by Defendant in its motion to dismiss, if

---

[1]     *Amici* affirm that no counsel for a party authored this brief in whole or in part, and no person other than *amici* or their counsel contributed any money to fund its preparation or submission. Plaintiff Cross River Bank is a member of the American Bankers Association, but did not author this brief in whole or in part and did not contribute any money to fund its preparation or submission.

[2]     Descriptions of *amici* associations appear in the Appendix to this brief. None of the *amici* associations is a subsidiary or affiliate of any publicly-owned corporation.

accepted, would undermine this cardinal rule at great harm to the modern, multi-trillion dollar U.S. credit markets and to *amici*'s members.

## SUMMARY OF ARGUMENT

I. A.  For hundreds of years, the U.S. credit markets have relied on long-settled expectations regarding usury law.  Since the first half of the nineteenth century, courts, including the U.S. Supreme Court, have recognized the cardinal rule that a loan that is not usurious in its inception cannot be rendered usurious subsequently, including by being sold or transferred to a third party.

B.  The cardinal rule was effectively incorporated into the National Bank Act of 1865 ("NBA"), which completely preempts state usury claims against national banks.  The Federal Deposit Insurance Act of 1980 ("FDIA") provides materially identical protection, and preemption, for loans (1) originated by federally insured state-chartered banks, like Plaintiff Cross River Bank, and (2) transferred to third parties, such as loan purchasers or assignees, like Marlette Funding LLC.

C.  Despite the cardinal rule, Defendant contends that the FDIA's preemption provisions do not apply to a loan that is originated by a bank (like Cross River Bank) if that loan is sold or assigned to a non-bank (like Marlette).  Defendant bases its arguments on the Second Circuit's decision in *Madden* v. *Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015).  As recently and powerfully explained by the Office of the Comptroller of the Currency ("OCC") and United States Solicitor General ("SG"), *Madden* was fundamentally erroneous, because, among other things, it contradicts the cardinal rule and the NBA/FDIA.  Indeed, the Second Circuit's *Madden* decision failed to even address the cardinal rule, despite its clear applicability to the facts of the case.  Simply put, this Court should not adopt *Madden*.[3]

---

[3]    As explained by the OCC and SG, *Madden* was erroneous for reasons stretching beyond its

II.   Adopting *Madden* here would not only sow further error into the federal case law and widen a split among the federal courts, but it would introduce further uncertainty and costs to the loan purchase markets.  Those effects will spread upstream to the loan origination market, reducing the availability of credit and thereby harming the U.S. financial system and economy.

Indeed, though *Madden* was decided relatively recently, in May 2015, economic research shows that its unintended and negative impact is already being felt in the Second Circuit's marketplace.  Extending *Madden* here would create significant concern among lenders nationwide and import this observed harm into Colorado.

## ARGUMENT

In its separate action against Marlette, Defendant cites *Madden* for the proposition that Marlette "and other non-banks cannot . . . enforce a bank's federal interest rate exportation rights when they purchase loans from banks because banks cannot validly assign such rights to non-banks." (Dkt. # 17-1, Am. Compl. ¶ 29.)  Similarly, in this action, Defendant cites *Madden* for the proposition that, "although a non-bank could purchase . . . debt from a national bank, the non-bank could not enforce the bank's interest exportation rights."  (Dkt. # 17, Motion to Dismiss at 8-11.)  But *Madden*, which is obviously not binding on this Court, was "contrary" (as Defendant admits, Dkt. # 17-1, Am. Compl. ¶ 29) to prior decisions of other Courts of Appeal, clearly erroneous as a matter of law, and has led to harmful economic effects on the loan markets, especially in the extension of credit to low-

---

violation of the cardinal rule.  *See* Brief for the United States as *Amicus Curiae* at 10-13, *Midland Funding, LLC* v. *Madden*, No. 15-610, 2016 WL 2997343 (U.S. May 2016) ("OCC/SG Brief") (discussing *Madden*'s failure to address 12 U.S.C. 24(Seventh), which identifies "the power to sell loans as an additional enumerated power of national banks").  This *amicus* brief does not specifically address those issues, because the cardinal rule—which was incorporated into Section 85 of the NBA and Section 27 of the FDIA—is sufficient for this Court to reject Defendant's contention that loans that are validly originated at inception may become invalid through assignment or sale.

income individuals.  Simply put, this Court should reject Defendant's invitation to adopt *Madden*.

I.   *MADDEN* **CONTRADICTS IMPORTANT, LONG-SETTLED EXPECTATIONS CONCERNING USURY LAW.**

A.  **For Over Two Hundred Years, It Has Been Well-Established That a Valid Loan Cannot Be Rendered Usurious by Selling or Assigning It to a Third Party.**

Courts have long recognized the valid-when-made doctrine as a fundamental principle of law. *See*, *e.g.*, *Watkins* v. *Taylor*, 16 Va. 424, 436 (1811) ("[I]f it was not usury *at the time* when the contract was entered into, no *after* circumstance can make it so; and any argument, therefore, drawn from after circumstances, would be improper." (emphases in original)); *Tuttle* v. *Clark*, 4 Conn. 153, 157 (1822) (holding that "this note, free from the taint of usury, in its origin," did not become usurious by the subsequent sale); *Tate* v. *Wellings*, 100 Eng. Rep. 716, 721 (K.B. 1790) (opinion of Buller, J.) ("Here the defence set up is that the contract itself was illegal; and in order to support it, it must be shewn that it was usurious at the time when it was entered into; for if the contract were legal at that time, no subsequent event can make it usurious."); *see also* 1 William Blackstone, Commentaries on the Laws of England 379-80 n.32 (18th London ed., W.E. Dean 1838) ("The usury must be part of the contract in its inception . . . .").

This principle was recognized by the U.S. Supreme Court in 1828, when it held that a non-usurious loan could not become usurious by reason of its sale or assignment.  *Gaither* v. *Farmers & Mechs. Bank*, 26 U.S. 37, 43 (1828).  In 1833, the Supreme Court confirmed that it was a "cardinal rule" of usury that the determination of whether a loan is usurious occurs at the time of origination. *Nichols* v. *Fearson*, 32 U.S. 103, 109 (1833).  To hold otherwise, the Court noted, would mean that "a contract, wholly innocent in its origin, and binding and valid, upon every legal principle, [would be] rendered, at least, valueless, in the hands of the otherwise legal holder."  *Id.* at 110.

**B.  The NBA and FDIA Incorporate the Cardinal Rule and Completely Preempt State-Law Usury Claims.**

Section 85 of the NBA permits a national bank to "charge on any loan . . . interest at the rate allowed by the laws of the State . . . where the bank is located," 12 U.S.C. § 85, and "completely pre-empts . . . a state-law claim of usury against a national bank," *Beneficial Nat'l Bank* v. *Anderson*, 539 U.S. 1, 8-11 (2003).   Because the valid-when-made rule was firmly entrenched in American jurisprudence by the time Congress enacted Section 85 of the NBA in 1864, Congress is also presumed to have incorporated that rule in Section 85.  *See Astoria Fed. Sav. & Loan Ass'n* v. *Solimino*, 501 U.S. 104, 108 (1991) ("[W]here a common-law principle is well established, . . . the courts may take it as given that Congress has legislated with an expectation that the principle will apply 'except when a statutory purpose to the contrary is evident.'" (internal citations omitted)).

The valid-when-made doctrine is crucial to the proper functioning of the loan markets, which rely heavily on the ability of loan originators to sell or assign the loans to others.  *See* OCC, Mortgage Banking Comptroller's Handbook at 3, 38 (Feb. 2014) ("Banks participate in the secondary market to gain flexibility in managing their long-term interest rate exposures, to increase liquidity, manage credit risk, and expand opportunities to earn fee income. . . . Many banks engaged in mortgage banking activities originate loans and sell them into the secondary market.").[4]  As the OCC and SG recently explained, the "power explicitly conferred on national banks by Section 85[,] *i.e.*, the power to originate loans at the maximum interest rate allowed by the national bank's home State," necessarily includes the "power to transfer a loan, including the agreed-upon interest-rate term, to an entity other than a national bank."  OCC/SG Brief at 7-8.[5]  "A national bank's federal

---

[4]      *Available at* https://tinyurl.com/kt89bg2.

[5]      Indeed, "[w]hen Congress enacted Section 85's earliest statutory antecedent, it was already

right to charge interest up to the rate allowed by Section 85 would be significantly impaired if the national bank's assignee could not continue to charge that rate." *Id.* at 8. Therefore, "Congress's conferral of [a] federal right" to charge interest "up to the maximum rate allowed by the bank's home State" should "be understood to incorporate the understandings that (a) *sale of loans is an integral aspect of usual banking practice*, and (b) *a loan that was valid when made will not be rendered usurious by the transfer*. To the extent that application of [state] usury law would prevent [the bank] from fully exercising the powers conferred by Section 85, state law is preempted." *Id.* at 9-10 (emphases added). "Put another way, there is an 'irreconcilable conflict' between the NBA and any state law that would preclude [the bank]'s assignees from charging the full amount of interest that is permitted by the laws of [the bank]'s home State." *Id.* at 10 (parentheticals omitted).

In 1980, with the stated goal of "prevent[ing] discrimination against State-chartered insured depository institutions," Congress enacted Section 27 of the FDIA. 12 U.S.C. § 1831d. Section 27 provides that, if the interest rate "allowed by the laws of the State . . . where the bank is located" is greater than the rate permitted by "any State constitution or statute," that constitution or statute "is hereby preempted for purposes of this section." *Id.* This provision "borrow[s] from [Section 85] and incorporate[s]" its language to "achieve[] parity between national banks and their state-chartered counterparts." *Greenwood Trust Co. v. Mass.*, 971 F.2d 818, 827 (1st Cir. 1992).[6] Courts have therefore held that Section 85 of the NBA and Section 27 of the FDIA "should be interpreted the

established that a bank's power to sell loans was a 'necessarily implied' corollary of the power to originate loans." OCC/SG Brief at 7-8 (quoting *Planters' Bank of Miss. v. Sharp*, 47 U.S. (6 How.) 301, 322 (1848)).

[6]     *See also* Federal Deposit Insurance Corporation ("FDIC"), Interpretive Letter No. 93-27, 1993 WL 853492, at *1 (July 12, 1993) ("We have stated consistently that [Section 27 of the FDIA] was intended to give state-chartered FDIC-insured banks the same 'most favored lender' status and right to export interest enjoyed by national banks under . . . § 85 [of the NBA].").

same way." *Id.* ("The historical record clearly requires a court to read the parallel provisions of [the

FDIA] and the Bank Act *in pari materia.*").

Accordingly, under the FDIA, the exclusive cause of action for usury against a federally

insured state-chartered bank (like Cross River Bank) is federal. *See Discover Bank* v. *Vaden*, 489

F.3d 594, 606 (4th Cir. 2007) ("We find the analyses of the FDIC and our sister circuits persuasive.

Given the express preemption language of the FDIA, the statute's legislative history affirming

Congress' intent to provide competitive equality between national and state-chartered banks, the

virtual identity of the preemption language in the NBA and that of the FDIA, and the Supreme

Court's finding of complete preemption under the NBA, we are hard-pressed to conclude other than

that Congress intended complete preemption of state-court usury claims under the FDIA."), *rev'd on*

*other grounds*, 556 U.S. 49 (2009).[7]   State-law usury claims against assignees (like Marlette) of loans

originated by insured state banks are therefore also preempted. *See Sawyer* v. *Bill Me Later, Inc.*, 23

F. Supp. 3d 1359, 1363-70 (D. Utah 2014).

## C.  As the OCC and SG Have Recognized, the Second Circuit's Decision in *Madden* Constitutes Legal Error and Should Not Be Extended Here.

In its motion to dismiss, Defendant relies on the Second Circuit's May 2015 decision in

*Madden*, the result of which called into question the status of the cardinal rule in that Circuit.

(Dkt. # 17, Motion to Dismiss at 8-11.)  This Court should reject the invitation to extend *Madden*,

because, as decisions from other courts confirm—and as the OCC and SG have emphatically

---

[7]      *See also* FDIC, Interpretive Letter No. 93-27, *supra* ("[W]e concluded that Section 521 preempts the laws of an out-of-state borrower's home state, to the extent that such laws purport to restrict the interest or fees . . . that an FDIC-insured state bank is authorized to assess by its chartering state.").

stated—the "court of appeals' decision [in *Madden*] is incorrect." OCC/SG Brief at 6.[8]

*Madden* is based on a fundamentally erroneous premise: "so long as application of [state] usury law to petitioners' collection activities would not entirely prevent national banks from selling consumer debt, state law is not preempted," and a loan that was not usurious at origination can become so upon transfer. *Id.* The *Madden* court purported to base its decision on Section 85 preemption grounds; however, in its incomplete analysis, the court failed to even reference, let alone discuss, the cardinal rule. As the OCC and SG observed, *Madden*'s "analysis reflects a misunderstanding of Section 85 and of th[e Supreme] Court's precedents." *Id.* Rather, "[u]nder the long-established 'valid-when-made' rule, if the interest-rate term in a bank's original loan agreement was non-usurious, the loan does not become usurious upon assignment, and so the assignee may lawfully charge interest at the original rate." *Id.* at 8. Indeed, "[a] national bank's federal right to charge interest up to the rate allowed . . . would be significantly impaired if the national bank's assignee could not continue to charge that rate." *Id.* at 8.

The Fifth Circuit, Seventh Circuit, and Eighth Circuit have all, contrary to *Madden*, enforced this "valid-when-made" rule. *See Olvera* v. *Blitt & Gaines, P.C.*, 431 F.3d 285, 289 (7th Cir. 2005) ("But once assignors were authorized to charge interest, the common law kicked in and gave the assignees the same right, because the common law puts the assignee in the assignor's shoes, whatever the shoe size."); *Krispin* v. *May Dep't Stores Co.*, 218 F.3d 919, 924 (8th Cir. 2000) ("[W]e agree with the district court that it makes sense to look to the originating entity (the bank), and not the ongoing assignee (the store), in determining whether the NBA applies."); *FDIC* v. *Lattimore Land*

---

[8]     The OCC and SG ultimately recommended that the Supreme Court deny *certiorari* in *Madden*, in part because of the "parties' failure to present the full range of preemption arguments below." OCC/SG Brief at 17-20.

*Corp.*, 656 F.2d 139, 148-49 & n.17 (5th Cir. 1981) ("The non-usurious character of a note should not change when the note changes hands.").[9]  *Madden* is an outlier—incomplete and erroneous—and this Court should not extend its holding to this District.

## II.   ADOPTING *MADDEN* WOULD HAVE HARMFUL ECONOMIC CONSEQUENCES.

"[G]iven the significant costs that adopting the decision would entail, any jurisdiction contemplating implementing *Madden* must seriously consider the costs that necessarily accompany such a ruling."  *See* Note, Michael Marvin, *Interest Exportation and Preemption:*  Madden*'s Impact on National Banks, the Secondary Credit Market, and P2P Lending*, 116 Colum. L. Rev. 1807, 1848 (Nov. 2016).  Extending *Madden* here would have substantial negative consequences for the credit markets and for the Colorado and national economies.

"Credit availability is a crucial ingredient in any advanced economy's recipe for economic growth because credit can support investment in productive enterprises and can smooth household spending from fluctuations in income."  James McAndrews, Fed. Reserve Bank of N.Y., Credit Growth and Econ. Activity after the Great Recession (Apr. 16, 2015).[10]  Commercial banks provide vital access to capital and credit, especially for consumers and small businesses, which, unlike larger businesses, do not have access to the debt markets to fund themselves.  *See* Karen Gordon Mills & Brayden McCarthy, *The State of Small Business Lending: Credit Access during the Recovery and*

---

[9]     Though a district court in the Northern District of Illinois recently, *sua sponte* and with no briefing, looked to *Madden* as the only Court of Appeals decision "to have squarely addressed the issue" of whether "NBA preemption applies to *assignees* of loans originated by national banks," *Eul* v. *Transworld Sys.*, 2017 WL 1178537, at *5 (N.D. Ill. Mar. 30, 2017), this was wrong—the weight of precedent, and the OCC and SG brief, clearly reject *Madden*'s reasoning.

[10]    *Available at* https://tinyurl.com/ma3yk6y; *see also* Elizabeth A. Duke, Fed.  Reserve Bd. of Governors, Fostering a Healthy Credit Environment Speech (June 30, 2010), https://tinyurl.com/kd8xb9z ("Credit plays a critical role in our economy.").

*How Tech. May Change the Game* (Harvard Bus. Sch. Working Paper No. 15-004, 2014).[11]

As of December 2016, insured depository institutions held over $9 trillion in outstanding loans.  *See* FDIC, Statistics on Depository Institutions Report—Net Loans and Leases (Dec. 31, 2016).[12]  That does not include the approximately $10 trillion in securitized loans that were originated by various lenders, including banks,[13] and then packaged and sold to investors, or the large volume of loans originated and sold outside of securitizations.[14]  These loans include consumer loans (*e.g.*, credit card loans, auto loans, other personal loans), residential loans (primarily home mortgages), and loans to businesses of all sizes.  Because of banks' central role in these vitally important credit markets, economists have recognized that "the impairment of banks' ability to extend credit . . . has the potential to hinder investment and adversely affect the overall economy," including small businesses and the labor markets.  McAndrews, *supra*.[15]

Banks' ability to sell or assign the loans they originate provides them the liquidity to support their lending operations, and is therefore important to banks' safety and soundness.  If loans could not be resold by banks, or the ability to do so was restricted, banks would be required to reduce the

---

[11]    *See also* Bd. of Governors of Fed. Reserve Sys., Report to Congress on the Availability of Credit to Small Business at 2 (Sept. 2012), https://tinyurl.com/ll6jr98; Fed. Reserve Bank of Phila., Consumer Credit & Payments Statistics (Oct. 22, 2015), https://tinyurl.com/fedreservestatistics.

[12]    *Available at* https://tinyurl.com/fdicstatistics.

[13]    *See* Sec. Ind. and Fin. Mkts Ass'n, Statistics: US ABS Issuance and Outstanding, US Mortgage-Related Issuance and Outstanding (Mar. 20, 2017), https://tinyurl.com/sifmastatistics.

[14]    *See, e.g.,* Fed. Trade Comm'n, The Structure and Practices of the Debt Buying Industry at ii, 7 (Jan. 2013), https://tinyurl.com/ftcstructureandpractices.

[15]    *See also* Burcu Duygan-Bump et al., *Fin. Constraints & Unemployment: Evidence from the Great Recession* 1 (Fed. Reserve Bank of Bos. Working Paper No. QAU10-6, 2011) ("Unlike larger firms, which have broader access to capital markets, small businesses are highly dependent on bank financing.  An important implication is that any kind of disruption in the flow of bank credit may have significant real effects on the labor market.").

amount of credit they extend and to increase the costs for the reduced amount of credit they do

extend.  Adopting *Madden*, and thereby rejecting the cardinal rule, would have exactly this adverse

effect, because loan purchasers would be exposed to a patchwork of state-law usury limits, such as

the one Defendant seeks to enforce.  Given the risk of being limited to lower rates of interest than

allowed on the face of the loan, and potentially the voiding of the loan, loan purchasers would pay

less to loan sellers, or forgo loan purchases altogether.[16]

Judge Posner easily recognized this very danger in the Seventh Circuit's *Olvera* decision,

reasoning that failure to enforce the valid-when-made rule:

> would push the debt buyers out of the debt collection market and force the original
> creditors to do their own debt collection.  Borrowers would not benefit on average,
> because creditors, being deprived of the assignment option as a practical matter (the
> statutory rates being far below the market interest rates for delinquent borrowers),
> would face higher costs of collection and would pass much of the higher expense on
> to their customers in the form of even higher interest rates.

431 F.3d at 288.  The end result is "to make the credit market operate less efficiently."  *Id.*; *see* Kirby

M. Smith, *Banking on Preemption:  Allowing National Bank Act Preemption for Third-Party Sales*,

83 U. Chi. L. Rev. 1631, 1681 (Summer 2016) ("[A] finding that preemption does not continue upon

sale of a loan would harm all consumers by increasing the cost of credit and likely cutting some

marginal debtors out of the market.").  In other words, Defendant's position would harm, not help,

Colorado consumers and small businesses, who will end up paying higher interest rates or being

denied credit.  Lower-income individuals, as higher-risk borrowers, and small businesses, which are

more dependent on bank financing than large corporations, will naturally bear the brunt

---

[16]     Sales of loans typically include representations and warranties that the loans are collectible in accordance with their terms and that the sale does not violate any law.  Defendant's position, if accepted, would chill sellers from making such representations and warranties, further depressing the price of loans sold by originators or rendering sales infeasible.

of these effects.[17]

Adopting Defendant's position would have other costly consequences. Entities that previously purchased or sold Colorado loans, in reliance on the cardinal rule of usury law, could face a wave of legal disputes, brought both against loan purchasers for collecting interest as permitted in loan agreements and against loan sellers for the loss in value of the sold loans. Further, by threatening to reduce the value and liquidity of the multi-trillion-dollar portfolio of loans that banks currently hold, the decision could have adverse implications for the safety and soundness of the banking system.

The aforementioned negative consequences of endorsing Defendant's attack on the valid-when-made rule *are not just theoretical*. Since *Madden* was issued two years ago, "[s]ome lenders have decided to exclude the Second Circuit states . . . from their marketing and lending programs." *See* Charles M. Horn & Melissa Hall, *The Curious Case of* Madden v. Midland Funding *and the Survival of the Valid-When-Made Doctrine*, 21 N.C. Banking Inst. 1, 22 (Mar. 2017).[18] Similar effects have been felt in the securitization market, as firms have removed loans made to borrowers in the Second Circuit from asset-backed securitizations due to usury concerns. *See* Horn & Hall, *supra*, at 22.[19] A study on *Madden*'s effects published one year after the decision observed that *Madden* especially "reduced credit availability for higher-risk," *i.e.*, lower-income, "borrowers." *See* Colleen Honigsberg *et al.*, *What Happens When Loans Become Legally Void? Evidence From a Natural*

---

[17]     *See* William F. Baxter, *Section 85 of the Nat'l Bank Act and Consumer Welfare*, 1995 Utah L. Rev. 1009, 1023 (1995); Mills & McCarthy, *supra*.

[18]     *See also* Joy Wiltermuth, *Usury worries hit Avant collateral*, Int'l Fin. Rev., Aug. 21, 2015, 2015 WLNR 24859283.

[19]     *See also* Will Caiger-Smith, *Prospect Capital may rejig ABS deals amid usury worries*, Sept. 4, 2015, Int'l Fin. Rev., 2015 WLNR 26337187.

*Experiment* at 29, Columbia Bus. Sch. Research Paper No. 16-38 (Dec. 12, 2016) (noting, *inter alia*, that "after *Madden*, loans to borrowers with FICO scores below 644 virtually disappeared.").[20] Commentators have therefore observed that *Madden* "has cast at least a temporary pall on loan sales and trading activity," and that the decision's "adverse short-term impact" will only be "properly limited in its scope and impact" if rejected "by other state or federal courts." Horn & Hall, *supra*, at 1.[21]

An analogous departure from long-established precedent—with similar resulting ill effects— occurred in Georgia in 2002, when the state enacted a statute that, for the first time, imposed unrestricted liability for assignees of higher-cost mortgages for any claim that could be asserted against the originator. *See* 2002 Ga. Laws 455, § 7-6A-6. In response, ratings agencies ceased rating securities backed by mortgage loans originated in Georgia, explaining that they could not evaluate the potential risk to investors. Henry Unger & Robert Luke, *Compromise Reached on Georgia Lending Law*, Atlanta J. Const., Feb. 1, 2003, 2003 WLNR 19578731. Financial institutions refused to buy mortgage loans originated in Georgia, and a number of lenders withdrew or substantially limited their operations in the state. *Id.* Faced with an impending crisis and enormous harm to consumers, Georgia amended the law to limit assignee liability. *See id.*; 2003 Ga. Laws 1, § 1.

Were this Court to reject the cardinal rule of usury and instead endorse *Madden*, the availability of credit would also be reduced in Colorado. Lenders nationwide, like *amici*'s members, would face increased uncertainty and costs. Those costs, ultimately, would be borne by borrowers and businesses seeking credit, and by the broader state and national economies that rely on

---

[20]     *Available at* https://tinyurl.com/Honigsberg.

[21]     *See also* Marvin, *supra*, at 1840 ("The end result of th[e] price correction [caused by *Madden*] will be distorted investment decisions and concomitant inefficiencies.").

that credit to function.

## CONCLUSION

For the foregoing reasons, this Court, in deciding the pending motions, should reject any reliance on the Second Circuit's decision in *Madden*, and affirm the long-established cardinal rule of usury.

Dated:  May 23, 2017

Jeremy R. Newell
Paige E. Pidano
THE CLEARING HOUSE ASSOCIATION L.L.C.
1101 Pennsylvania Avenue, N.W.
Suite 720 North Tower
Washington, DC 20004
(202) 649-4600

Thomas Pinder
AMERICAN BANKERS ASSOCIATION
1120 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 663-5000

Elliot Ganz
LOAN SYNDICATIONS AND TRADING ASSOCIATION
366 Madison Avenue
New York, New York 10017
(212) 880-3000

/s/ Matthew A. Schwartz
H. Rodgin Cohen
Michael M. Wiseman
Matthew A. Schwartz
Leonid Traps
SULLIVAN AND CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Fax:  (212) 558-3588
schwartzmatthew@sullcrom.com

*Attorneys for* Amici Curiae *The Clearing House Association L.L.C., American Bankers Association, and Loan Syndications and Trading Association*

## APPENDIX

**The Clearing House**, established in 1853, is the oldest banking association and payments company in the U.S.  Its members include the world's largest commercial banks; they hold more than half of all U.S. deposits and employ over one million people in the U.S. and over two million people worldwide.  The Clearing House Association L.L.C. is a nonpartisan advocacy organization that represents the interests of its owner banks by developing and promoting policies to support a safe, sound, and competitive banking system that serves customers and communities.  Its affiliate, The Clearing House Payments Company L.L.C., is regulated as a systemically important financial market utility.  It owns and operates payments technology infrastructure that provides safe and efficient payment, clearing, and settlement services to financial institutions, and clears almost $2 trillion every day.

**The American Bankers Association** ("ABA") is the principal national trade association of the financial services industry in the United States.  Founded in 1875, the ABA is the voice for the nation's $13 trillion banking industry and its more than one million employees.  ABA members are located in all fifty States and Washington, D.C. and include large and small financial institutions.  The ABA's members hold a substantial majority of the U.S. banking industry's domestic assets and are leaders in all forms of consumer financial services.

**The Loan Syndications and Trading Association** is a financial trade association whose mission is to promote a fair, orderly, efficient, and growing corporate loan market and to provide leadership in advancing and balancing the interests of all market participants.  Among its 380 members are national and state-chartered banks as well as institutional lenders who make, purchase, and trade hundreds of billions of dollars in corporate loans.